JODI LINKER
Federal Public Defender
Elisse Larouche
Assistant Federal Public Defender
Northern District of California
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:       elisse_larouche@fd.org

Counsel for Defendant Reyes Aleman

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 2022–390 RS |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| MAYCOL REYES ALEMAN, | **Court:**  Courtroom 3, 17th Floor |
| Defendant. | **Hearing Date:**  April 4, 2023 |
| | **Hearing Time:**  2:30 p.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................i

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2

    I.     A childhood marked by threats and violence and an escape as dangerous.......................2

         A.     Mr. Reyes' childhood and adolescence in Honduras............................................2

         B.     Unsafe conditions in Honduras ......................................................................4

         C.     A harrowing escape from Honduras and journey to the U.S. ...............................6

    II.    Once in the U.S., Mr. Reyes was labor trafficked into drug dealing and then left with no real way out.......................................................................................................8

    III.   Mr. Reyes' time in custody and future...........................................................9

ARGUMENT..............................................................................................................10

    I.     The nature and circumstances of the offense must be put into a larger context of Mr. Reyes' vulnerability and role. ...........................................................................10

    II.    Mr. Reyes' history and characteristics weigh in favor of a significant downward variance. ...............................................................................................13

         A.     Youth...................................................................................................13

         B.     Poverty, vulnerability, and desperation as a victim of gang violence and labor trafficking...........................................................................................14

    III.   Deterrence cannot be achieved by prison alone when individuals are trafficked into drug sales.................................................................................................17

    IV.   Seriousness of the offense, promote respect for the law, and provide just punishment . 17

    V.    Protection of the public .........................................................................18

    VI.   Providing Mr. Reyes with needed training, medical care, or other correctional treatment in a the most effective manner. .......................................................................18

CONCLUSION..........................................................................................................19

# TABLE OF AUTHORITIES

**Federal Cases**

*Kimbrough v. United States*,
  128 S. Ct. 558 (2007) ................................................................................................ 9

*United States v. Booker*,
  543 U.S. 220 (2005) ................................................................................................ 9

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) .................................................................................. 9

*United States v. Diaz*,
  884 F.3d 911 (9th Cir. 2018) ...................................................................... 14, 16, 17

*United States v. Rodriguez*,
  44 F.4th 1229 (9th Cir. 2022) .................................................................................. 14

**Federal Statutes**

18 U.S.C. § 3553 ........................................................................................... 1, 9, 10

**INTRODUCTION**

Maycol Reyes Aleman is a 20-year-old young man, with no prior convictions, from Honduras. He traveled to the United States, alone, as teenager, to avoid his recruitment into the gangs in Honduras – a trajectory that would have involved harming others and endanger to his and his family's lives. After surviving a truly harrowing journey through Honduras, Guatemala, and Mexico, Mr. Reyes entered the U.S. through Texas. Desperate for a way to his only contact in the U.S., Mr. Reyes accepted an offer for a ride from a man. This fateful decision turned the course of his life once again as that man, once Mr. Reyes was unable to pay him back, threatened him and eventually labor trafficked him into selling drugs. Although the government may see it otherwise, at least four immigration experts have deemed Mr. Reyes a victim of trafficking was identified as a victim of labor trafficking; he has a pending Trafficking-Visa (T-Visa).

Mr. Reyes is extremely remorseful for his conduct of selling narcotics. He was surveilled by the government on a wiretap, sold heroin and fentanyl to an undercover agent on numerous instances, and was eventually arrested on June 2, 2022. Even after the government declined Mr. Reyes' request to consider alternative charges to allow for more immigration relief opportunities, Mr. Reyes still filed no pretrial motions and, after reviewing voluminous discovery, including wiretaps, he chose to accept responsibility and plead guilty to Conspiracy to Distribute Fentanyl and Heroin, 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) in January 2023. The plea agreement included a base offense level of 30, a possible two-level reduction for Safety Valve, a possible two-level reduction for a minor role adjustment, a possible two-level reduction if all co-defendants pleaded guilty (group disposition), and a three-level reduction for acceptance of responsibility. The government agrees not to ask for a sentence higher than 39 months.

The Presentence Report ("PSR") applied all reductions except for the group disposition to arrive at a final offense level of 23. The government objects to the application of the minor role reduction. The PSR calculates Mr. Reyes' criminal history category at I, for a guideline range of 46-57 months. The defense agrees with the calculation. Probation recommends a downward variance and sentence of 30 months' custody.

The defense, like probation, also respectfully requests a downward variance, but asks for a

greater variance given Mr. Reyes' history and characteristics, the nature and circumstances of the offense, and other 3553(a) factors. Mr. Reyes has no prior convictions. He is a bright young man with a history of studying industrial mechanics. Unlike many cases involving individuals without status in the U.S., he has a possible path to status through a T-Visa and, as evident through supporting documents, will have support afforded to him as a victim of labor trafficking. While the government takes issue with this characterization due to Mr. Reyes' continued drug dealing, the broader, desperate circumstances this teenager was under when he was surveilled and arrested, the attestations from immigration experts, and the fact that the T-Visa has a specific waiver for those who commit criminal conduct, reveals a more nuanced situation. Someone like Mr. Reyes – a poor, vulnerable, youth – has already replaced him as on the streets. He is merely a pawn for drug and labor traffickers with the power and muscle to back up their threats.

Mr. Reyes is more than his traumas, however. He is ready to accept his punishment and has hope for his future law-abiding life. He respectfully requests that the court sentence him to one year and one day followed by the maximum supervised release term.

## BACKGROUND

**I.    A childhood marked by threats and violence and an escape as dangerous.**

### A.    Mr. Reyes' childhood and adolescence in Honduras

Mr. Reyes was born in December 2002 in Tegucigalpa, Honduras. PSR ¶ 54. His father left before he was born; he's never had contact with his father. PSR ¶¶ 54-55. Mr. Reyes' mother, Maria, primarily raised him, until she later met his stepfather. *Id*. Maria worked throughout Mr. Reyes' life and is still a schoolteacher. PSR ¶ 55. Even with her job, his mother could not provide basic needs for the family, including food and clothing for Mr. Reyes and his brothers and sister. *Id*. At around nine or ten years old, Mr. Reyes began working to help fill this gap. *Id*. He worked at a sawmill, as an assistant to a mechanic, and sold water with his uncle. PSR ¶¶ 55,74. Because the family relied on reach other so deeply and because Mr. Reyes' father was not present, he has always had a close relationship with his family, particularly his mother. PSR ¶¶ 55, 65.

Although Mr. Reyes enjoyed school, as he grew older, going to school became a dangerous endeavor. *See* PSR ¶ 57. Going to and from school, Mr. Reyes would be approached by gang

1  members from the MS-13 and 18th street gangs who tried to recruit him, threatened violence if he did

2  not acquiesce, and often attacked and injured him. *Id*.; *see also* Declaration of Elisse Larouche

3  ("Larouche Decl.") ¶ 2, Ex. A, Portman Decl. re: Maycol ("Maycol Decl.") ¶4, 7-9; Larouche Decl. ¶

4  11, Ex. J, Portman Decl. re: Jeyson Anthony Aleman Ayala ("Jeyson Decl.") ¶ 10. Mr. Reyes and his

5  mother attest to seeing constant kidnappings and killings by gang members. PSR ¶ 57; Portman Decl.

6  re: Maycol ¶ 5; Larouche Decl. ¶ 3, Ex. B, Portman Decl. re: Maria Adina Aleman Ayala ("Maria

7  Decl.") ¶ 5-7. Gang members would drive by in motorcycles, grab people, and take them away never

8  to be seen again. PSR ¶ 57; Ex. B, Maria Decl. ¶ 5-7. Mr. Reyes had two classmates who were killed

9  for refusing to join the gangs. PSR ¶ 57. His mother, Maria, remembers a whole family being

10  massacred at a party due to the gang violence. PSR ¶ 57; Ex. B, Maria Decl. ¶ 7.

11      Mr. Reyes' older brother, Jeyson, also explained the intense, pervasive impact of gangs in

12  Honduras in his declaration. *See* Ex. J, Jeyson Decl. ¶ 6. Jeyson saw that gang members tried to

13  recruit Maycol in Tegucigalpa because he was the right age, tall, charismatic, and smart – qualities

14  that would be valuable assets to the gang as Mr. Reyes was well liked. Ex. J, Jeyson Decl. ¶ 7-8. The

15  gangs would offer Mr. Reyes "gifts," but he rejected them because he knew there were strings

16  attached. *Id*. ¶ 9. The gangs began to feel disrespected by Mr. Reyes' rejections and escalated to

17  violence. *Id*. ¶ 9

18      Mr. Reyes, his mother, and brother recall several specific instances of violence. Men beat him

19  up to and from his route to school. PSR ¶ 57; Ex. B, Maria Decl. 10. Once, he was beat with a baton

20  or cudgel on his back and knees when gang members rode up on their motorcycles and attacked him.

21  PSR ¶ 57. On another occasion, gang members approached Mr. Reyes and a young woman near a

22  soccer field, beat them both, and then took a propane torch to burn them. *Id*.; Ex. A, Maycol Decl. ¶

23  7. Mr. Reyes remembers seeing the woman's shirt burn away. Ex. A, Maycol Decl. ¶ 7. The gang

24  members burned Mr. Reyes' left hand, leaving a scar. *Id*.; PSR ¶ 57, 66. Yet another time, Mr. Reyes

25  was stabbed his in his thigh on his way to school, and left in the road bleeding after he refused the

26  gangs' recruitment efforts of trying to give him a cell phone on which he was supposed to receive

27  orders. PSR ¶ 57. On another occasion his brother recalls going to look for Mr. Reyes one day when

28  Mr. Reyes was around 14 or 15 years old after he did not come home from school. Ex. J, Jeyson

Decl. ¶ 10. Jeyson saw Mr. Reyes running with several people in pursuit and Mr. Reyes ran into Jeyson's car explaining the gang members had been chasing him and wanted him to kill people for the gang. *Id.* Mr. Reyes' refusals had only intensified their efforts. *Id.* Mr. Reyes did not want to tell his family because he did not want them to worry. *Id.*; Ex. B, Maria Decl. ¶ 10.

As part of recruitment and threats, the gangs also would tell Mr. Reyes that he had to accept a cell phone, take orders, and go to the capital to collect "gang taxes" and injure and kill people as ordered. PSR ¶ 57. Mr. Reyes repeatedly refused until the threats were so intense that he gave in and said he would follow the gang's orders and would report the next day for his duties. But he knew he did not want a gang life of committing crime, hurting others, and putting himself and his family in constant danger. He chose to flee. PSR ¶¶ 57-58. To this day, Mr. Reyes' brother is harassed and threatened by the gangs due to his brother's absence. Ex. J, Jeyson Decl. ¶ 11. He is asked where Mr. Reyes almost weekly, the gangs send people to leave phones on the bus Jeyson drives on which people call and threaten him – naming each of his family members, and he receives threatening messages via WhatsApp. *Id.* ¶ 11, 14, 15. His brother fears that if Mr. Reyes returns, he would be killed. *Id.* ¶ 17.

Despite the violence around him and against him growing up, Mr. Reyes diligently tried to further his education, though at times he would stay home to avoid gang detection. Ex. B, Maria Decl. ¶ 11-13. He took courses in specialty mechanics and focused on industrial design in school. PSR ¶ 72; Larouche Decl., ¶ 9, Ex. H, School records. Specifically, he received certificates in Precision Mechanics, Mechanics, and Lathe Mechanics. PSR ¶ 72. Mr. Reyes' brother notes that the very qualities that made Mr. Reyes attractive to the gang are what made him a great person – he is a great brother and intelligent. Ex. J, Jeyson Decl. ¶ 17. Had he not fled for safety, he would have excelled in school and beyond. *Id.*

### B.    Unsafe conditions in Honduras

The conditions Mr. Reyes describes are not an anomaly or exaggeration. Gangs, ineffective government, drug trafficking, and poverty have all contributed to Honduras previously claiming the

title of "murder capital of the world" and having the second highest murder rate in 2017.[1] As a

Human Rights Watch Report of Honduras in 2020 stated, "[v]iolent organized crime continues to

disrupt Honduran society and push many people to leave the country."[2] Violence in Honduras

includes "homicide, extortion, kidnapping, torture, human trafficking, intimidation, and other threats .

. . ."[3] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are

two of the ten most dangerous cities in the world.[4] On top of and intertwined with the violence is the

government's failure to protect its citizens. "Marred by corruption and abuse, the judiciary and police

are largely ineffective."[5] The government has lost international funding after allegations of human

rights abuses.[6] There are also allegations of corruption by gang infiltration of the Honduran police

force.[7]

Although there are many reasons for the high crime and murder rates, political instability and

gang activity have contributed to the violence for decades. In the 1980's, the United States used

Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.*

Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries

unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal

groups began to form throughout Central America. *Id.* According to the Wilson Center, crime

generally goes unreported because of corruption, weak law enforcement, and active criminal groups.[8]

---

[1] Murder Rate by County 2023, WORLD POPULATION REVIEW, https://worldpopulationreview.com/country-rankings/murder-rate-by-country; *see also* Gangs in Honduras, INSIGHT CRIME (hereinafter Gangs in Honduras) at 1, ("In 2014, Honduras was considered the most violent nation in the world that was not at war."), https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf

[2] *Honduras, Events of 2020*, Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/honduras

[3] Country Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR at 1, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.

[4] Central America Refugee Crisis, U.N. REFUGEE AGENCY, https://www.unrefugees.org/emergencies/central-america/; *see also* Gangs in Honduras at 1

[5] *Honduras, Events of 2020*, Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/honduras

[6] Khan, Carrie, "Honduras Claims Unwanted Title of World's Murder Capital" Parallels, June 12, 2013, https://www.npr.org/sections/parallels/2013/06/13/190683502/honduras- claimsunwanted-title-of-worlds-murder-capital

[7] *Id.*

[8] *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON

In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the Honduran presidential election came under question as many organizations noticed irregularities with the results.[9] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012.[10]

Further compounding the political instability and violence in Honduras, according to the World Bank, "Honduras remains one of the poorest and most unequal counties in the Western Hemisphere."[11] Prior to COVID-19's impact and two Category 4 hurricanes in 2020, 25% of the population lived in extreme poverty and almost half lived in poverty, based on official poverty lines.[12] Human development outcomes are the lowest among the Latin American and Caribbean countries.[13]

The broad recognition of the violence, corruption, poverty, inequality, and general instability in Honduras, makes apparent why Mr. Reyes choose to undertake an extremely dangerous journey to the U.S. alone. It is no understatement to say his life was at stake.

### C.      A harrowing escape from Honduras and journey to the U.S.

When Mr. Reyes was beaten again and finally succumbed to the gangs and said he would work for them, he realized he had to flee Honduras to avoid the gang life becoming his reality. Ex. A, Maycol Decl. ¶ 11. The gang had told Mr. Reyes they would come the next morning to give him a gun, motorcycle, and a phone from which to take orders. *Id*. Before that could occur, he fled, alone, when he was 16 or 17 years old. PSR ¶ 58, 65; Ex. B, Maria Decl. ¶ 14. With only a little money, he started his approximately year-long journey to the U.S. Ex. A, Maycol Decl. ¶ 12. He took any ride

---

CTR RPT. ON AMERICAS (hereinafter Crime and Violence) at 1–2, https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.
[9] *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH, Dec. 2017, https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.
[10] *See* 2018 Crime & Safety Report.
[11] *The World Bank In Honduras*: *Overview*, World Bank, Last updated Oct. 4, 2022, https://www.worldbank.org/en/country/honduras/overview
[12] *Id*.
[13] *Id*.

he could find – on the back of construction trucks along rocks and sand, on buses, hitching a ride with anyone. *Id*. ¶ 13. Eventually arriving in Guatemala City, Mr. Reyes had to sleep out in the streets while he tried to figure out his next steps. *Id*. He continued to rely on a patchwork of transportation, assistance from random strangers, and gathering whatever food and water he could. *Id*. Occasionally, Mr. Reyes would pause his travel and look for work to save up enough money for the next leg of his journey. *Id*. He unloaded containers of sodas and milk, he helped with livestock, and he did whatever he could to make some money. *Id*. Although he spent many nights hungry, thirsty, and cold, he also experienced the true generosity of strangers who helped keep a teenage boy alive during this time.

In addition to these everyday hazards, Mr. Reyes faced more peril. He often traveled on the top of trains through Mexico. Ex. A, Maycol Decl. ¶ 14. Mr. Reyes and others would tie themselves to the top of the train, so they would not fall off. *Id*. He saw children looking for their parents who had fallen off the top of the train. *Id*. Guards with weapons would beat those on the train. *Id*. Gangs and other violent groups would prey on the vulnerable people– robbing them, beating them, and kidnapping them. *Id*. MS-13 and Mexican drug cartels had a major presence on the migrants' route, attempting to extort, kidnap, or hurt migrants. *Id*.

While traveling through Mexico, Mr. Reyes went through the most deeply harrowing experience when he was kidnapped. PSR ¶ 59; Ex. A, Maycol Decl. ¶ 15. Several men with larger firearms kidnapped him and put him in a disconnected container of a large semi-truck. *Id*. There were some 40 other captives held in the hot container, including women, children, and pregnant women. *Id*. People inside were crying, banging on the sides of the container, trying to get out. *Id*. Mr. Reyes remembers people dying because of the heat, exhaustion and lack of food and water. *Id*. The kidnappers were trying to extort their captives for money – they asked them for names and numbers of relatives they would call to demand money in exchange for their loved ones' safety. *Id*. At some point, people tried to escape the container and the kidnappers retaliated. PSR ¶ 59; Ex. A, Maycol Decl. ¶ 16-17. They dragged women by their hair, they beat them. Maycol Decl. ¶ 16. The most gruesome and heinous memories include the kidnappers brining Mr. Reyes into the house where they tortured people to get information, sometimes killing them; Mr. Reyes was tasked with cleaning the blood from the rooms. PSR ¶ 59; Ex. A, Maycol Decl. ¶ 17. Mr. Reyes remembers bone-chilling

details: ropes, masks, gloves, blood on the ground and sticky, bloody handprints on the wall that he had to clean. Ex. A, Maycol Decl. ¶ 18. He witnessed torture including wires wrapped around peoples' wrists and banging on people's bodies with a hammer. *Id.* For reasons Mr. Reyes still does not understand, the kidnappers eventually released him after what he believes was about a week. PSR ¶ 59; Ex. A, Reyes Decl. ¶ 18. Leaving in great physical and emotional pain and weak from little food and water, he luckily encountered people who gave him a pair of sandals and some food. Ex. A, Maycol Decl. ¶ 19. Alone, Mr. Reyes continued.

## II. Once in the U.S., Mr. Reyes was labor trafficked into drug dealing and then left with no real way out.

Eventually, Mr. Reyes crossed through Texas into the U.S. PSR ¶ 60; Ex. A, Maycol Decl. ¶ 20. However, his situation was still desperate – no money, no food, no way to get to his one contact – an uncle in Washington state. When he called his uncle, his uncle said he could not help him. Ex. A, Maycol Decl. ¶ 20. Desperate after coming so far, when a man named Carlos approached him, bought him something to eat and drink and said he could give him a ride with other migrants if Mr. Reyes would pay him back, Mr. Reyes knew that he was only way to survive. PSR ¶ 60; Maycol Decl. ¶ 20-21. That fateful decision led him to now be before the Court.

During the drive, Mr. Reyes realized Carlos was not a safe person. Carlos threatened others, including by preying on individuals' undocumented status by threatening to turn them over to immigration. Ex. A, Maycol Decl. ¶ 22. He also waved a gun in the car saying, "he wasn't playing with anyone." *Id.* Once in Washington and upon learning Mr. Reyes could not pay and his uncle would not pay, Carlos gave Mr. Reyes a phone to keep tabs on him and to get his money. *Id.* He threatened Mr. Reyes that he'd have to work for him if he could not pay him back. *Id.* After approximately one year, Mr. Reyes still could not pay Carlos back and Carlos threatened that he would charge his uncle. *Id.* ¶ 24. Mr. Reyes worried Carlos would harm his uncle or his family and eventually, because of fear, Mr. Reyes saw his only option as working for Carlos. *Id.* ¶ 25. Carlos directed him to take a Greyhound bus to Sacramento, which Mr. Reyes did, waiting until Carlos picked him up. *Id.* ¶ 25. Carlos then drove Mr. Reyes into Oakland, explained he would be selling drugs for him, and told him where to live, what drugs to sell, and where to sell. *Id.* ¶ 25. Everything

under Carlos' direction. *Id.* Mr. Reyes did not want to sell drugs but again, because of his fear and his need to stay alive and safe, he followed Carlos' orders. *Id.*

At the house where he had to live, there were some ten to twenty others like him. *Id.* ¶ 27. Others working off debts for transportation, crossing through the desert into the U.S. or for having drugs stolen from them, others facing threats to themselves and their families, and everyone trying to survive. *Id.* ¶ 26-27. Mr. Reyes recounts there being people younger than him – some only appearing 15 years old. *Id.* ¶ 26. Carlos explained to them their jobs – cutting drugs, selling drugs, how and where to sell different types of drugs. *Id.* ¶ 26-29.

Carlos maintained control by suggesting and telling Mr. Reyes that he knew his family, that he could get in contact with them, and by commenting about easy lines of communications between drug traffickers here and gangs in Honduras. *Id.* ¶ 30-31. Carlos made clear to Mr. Reyes that his family could be "taken out" "no problem." *Id.* Control was also maintained by controlling the money Mr. Reyes obtained from sales, not providing much food, and constantly changing the amount of debt that Mr. Reyes owed so that it seemed impossible to ever pay him back. *Id.* ¶ 32-34. Carlos also used physical violence – beating him on several instances or having others do so when Mr. Reyes did not sell enough drugs, was not a good "lookout," or when he was robbed and lost drugs. *Id.* ¶ 34.

One day, Carlos became angry at Mr. Reyes and hit him on the head with a gun. *Id.* ¶ 36. Mr. Reyes ran away. He was homeless in Oakland. *Id.* He looked for legitimate work but without shelter, language skills, or support, he could not find anything. *Id.* Desperate, Mr. Reyes spoke to his now co-defendant, Pizarro, who gave him a place to live and a job selling drugs to pay for his rent. *Id.* It was with Pizarro, in part, that Mr. Reyes sold the drugs to the undercover agent. *Id***.** Even after Mr. Reyes left Carlos, Carlos continued to harass him - sending Mr. Reyes messages, sending someone to rob him, and telling him he still owed Carlos money. *Id.* ¶ 37.

### III.   Mr. Reyes' time in custody and future

Mr. Reyes has been in custody since June 2, 2022 – nearly ten months. During this time, he has endured extremely challenging situations. He has feared for his safety and been attacked by other inmates. PSR ¶ 68, 70. He has not been able to regularly speak with his mother because of the international calls and lack for resources for him to have money on his books. He has been subject to

1   violence at the hands of jail deputies and after seeking out someone to speak to due to his anxiety

2   regarding his case and being in jail, he was placed in a mental health hold unit against his will, where

3   he had very limited access to outside or anyone else. PSR ¶ 68-69, 70.

4       Mr. Reyes has now been identified as a victim of human trafficking after several immigration

5   organizations were able to screen and interview him. *See* Larouche Decl. ¶ 5, Ex. D, ¶ 6, Ex. E. He

6   has obtained immigration counsel with the organization Justice at Last and the organization is

7   representing him in his T-Visa application. Ex. D. He hopes to obtain his T-Visa, better his education

8   and English skills, and find a safe place to restart his life.

9                                           **ARGUMENT**

10      A sentence of a year and a day would be sufficient but not greater than necessary to achieve the

11  sentencing goals of 18 U.S.C. § 3553(a). The Guidelines are only one factor among many to be

12  considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United*

13  *States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose

14  a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States*

15  *v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the

16  need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just

17  punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public

18  from further crimes of the defendant; and (6) provide the defendant with needed educational or

19  vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18

20  U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including:

21  the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

22  defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline

23  range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to

24  avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any

25  victims of the offense, § 3553(a)(7).

26  **I.    The nature and circumstances of the offense must be put into a larger context of Mr.
       Reyes' vulnerability and role.**

27

28      Mr. Reyes takes full responsibility for selling harmful drugs. He acknowledges the effect his

1   actions have on vulnerable populations and people struggling with addiction.[14] The stream of drug

2   sales and addiction in the Tenderloin is devasting and every sale contributes to this terrible

3   environment and harms those who suffer from addiction. The many lives lost to drugs, including

4   fentanyl, seems to be an unstoppable ill confronting society. Mr. Reyes contributed to this and

5   expresses deep remorse.

6       Mr. Reyes came to the attention of law enforcement and the DEA while he was selling drugs in

7   the Tenderloin neighborhood. After an undercover agent ("UC") made initial contact with Mr. Reyes

8   in July 2021, asking if Mr. Reyes had fentanyl, they engaged in several sales, mostly at escalating

9   quantities upon the UC's request for larger amounts and additional types of drugs. PSR ¶ 9-31. For

10  the first sale, the UC purchased seven grams (3.47 net weights) of fentanyl for $200 from Mr. Reyes.

11  PSR ¶ 10. The UC then asked to buy larger amounts – presumably to evaluate the depth of the source

12  of supply – and Mr. Reyes, a street-dealer who was under the control of a higher-level boss, did

13  whatever he could to oblige to make his trafficker happy and for Mr. Reyes to stay safe. *See* PSR ¶ 9-

14  31; Ex. A, Maycol Decl. ¶ 35. For example, during the third sale, in August 2021, Mr. Reyes gave the

15  UC the two ounces of heroin he'd asked for, but the UC then asked Mr. Reyes if he had more heroin.

16  PSR ¶ 13-14. Mr. Reyes did not – he only brought what he was supposed to sell and he had to contact

17  his co-defendant and supplier, Hever Suarez aka "Pizarro," to get the UC the additional requested

18  drugs. *Id.* Pizarro said he would come to deliver the additional amount and when there was confusion

19  about the amount, again Pizarro communicated with the UC, via Mr. Reyes' phone, to communicate

20  the details of the sale. PSR ¶¶ 16-17. This was the nature of the relationship with the UC. Mr. Reyes

21  relayed the requests and either one of his co-defendants - Pizarro or Flores - was necessary to obtain

22  the drugs. Often, Mr. Reyes had them communicate directly with the UC because Mr. Reyes did not

23  have control and his English was extremely limited. *See, e.g.*, PSR ¶ 22 (UC speaking with Pizarro on

24  the phone number associated with Mr. Reyes to organize details of sale); PSR ¶ 25 (UC receiving a

25  call from a number UC understood to be Mr. Reyes' but Flores was using his phone and it was Flores

26

27  _____

28  [14] Mr. Reyes intends to read a letter to the Court. Due to scheduling issues with Santa Rita Jail and
    mail delays, counsel could not obtain the letter in time to translate it and have it submitted.

DEFENDANT'S SENTENCING MEMORANDUM
*REYES ALEMAN*, CR 2022–390 RS

with whom the UC discussed what fentanyl and heroin was available).[15]

While the government will surely point to all the dangerous drugs that Mr. Reyes sold, critically, it was the UC who kept asking for the escalation. For example, it was upon the UC's specific request for pills, that Mr. Reyes obtained them. When the pills are first mentioned in messages, in September 2021, it was the UC that asked, "Wassup bro! Do you have the blue pills?" Later, on October 27, 2021, the UC asked Mr. Reyes "How much for 700 blue pills," and on October 31, 2021 he texted Mr. Reyes "Wassup bro I will need 600 pills this week." Larouche Decl. ¶ 12, Ex. K at US-600089-90. Mr. Reyes provided the price and said he'd prepare the order when he communicated with Pizarro his "cousin." The transaction again required Pizarro. The UC specifically told Mr. Reyes, "Call him [Pizarro] to make sure [about the deal] or tell him to call me so we can discuss" while noting the drug order of 600 blue pills. *Id*. at US-600091. Mr. Reyes' responded "I will tell my cousin to contact you," to ensure the deal could occur. *Id.* Further discussions solidify Pizarro's critical role in the transaction as the UC continues to ask Mr. Reyes about contact with his "cousin." *Id*. at US-600092.

In sum, Mr. Reyes clearly was part of drug trafficking that contributed to the harm of drug sales in the Tenderloin neighborhood. The Court, however, should consider Mr. Reyes' status as a victim of being labor trafficked into drug sales and his limited role as a means of communication and delivery, rather than as a supplier or organizer of sales. As originally found by the UC, Mr. Reyes was a street-level dealer selling small amounts. He was someone who could easily be caught and had no power to protect himself. Further, while the guideline range here is calculated based, in part, on the drug sale amounts, that amount is high *because of the* UC's requests for more drugs and higher amounts. The rationale behind the guidelines aligning and increasing with more serious drug types and weights is that more and more potent drugs are indicative of someone of greater danger, power,

---

[15] Additionally, on September 16, 2021, it was Pizarro that called the UC to discuss a future drug sale and then Mr. Reyes executed on behalf of Pizarro. PSR ¶ 19. During a sale on October 15, 2021, again Pizarro spoke to the UC using Mr. Reyes' cell phone and the UC asked Pizarro for more drugs. PSR ¶ 21. Again, on October 25, 2021, Pizarro called the UC and the UC asked him for half a pound of fentanyl. PSR ¶ 23. Thereafter, the UC and Mr. Reyes communicated about details to make the transaction happen. *Id*. In these illustrative instances, Mr. Reyes was again acting as a conduit for communication with Pizarro and delivery person for the drugs, but the constant reliance on Pizarro demonstrates Mr. Reyes' limited role.

1   or access. But that rationale does not apply here. Mr. Reyes was never a high supply dealer – he

2   provided the UC with what he asked for only with the direction and supply of Flores and Pizarro.

3   Accordingly, the Court should give lesser weight to the guidelines here and consider the full scope of

4   conduct in assessing the nature and circumstances of the offense.

5   **II.    Mr. Reyes' history and characteristics weigh in favor of a significant downward variance.**

6         **A.    Youth**

7       Mr. Reyes was only 18 years old when the UC first approached him in July 2021. Today, at 20

8   years old, he is still young. His youth weighs in favor of a downward variance for two reasons. First,

9   as scientific evidence has made clear, the U.S. Sentencing Commission has acknowledged, and courts

10  in this district have noted "brains continue to develop until approximately age twenty-five, and

11  developmental differences relevant to sentencing generally persist until around that age." *United*

12  *States v. Johnson*, No. 05-CR-00167-WHA-5, Dkt. 2063, 2021 WL 5037679 at *2–3 (N.D. Cal. Oct.

13  30, 2021) (reviewing U.S. Sentencing Commission Report). As the Supreme Court recognized,

14  proclivity for risk and inability to assess consequences are traits present as the brain is still

15  developing. *Miller v. Alabama*, 567 U.S. 460, 472–73 (2012)). Because of these trains, moral

16  culpability is lessened and there is a prospect that with maturity and neurological development,

17  deficiencies will be reformed. *See id*. Accordingly, criminal conduct during one's teens and early

18  twenties is not indicative of hardened criminal behavior, but rather an inability to make sound

19  decisions and think through consequences.

20      In Mr. Reyes' case, the issue of brain development and sound decision-making was further

21  compounded because the constant traumas in his life – poverty, hunger, violence, gang threats,

22  surviving a years-long journey alone in dangerous circumstances, threats by traffickers, and

23  trafficking itself – created toxic stress. Toxic stress refers to stress that is prolonged, overwhelming,

24  and not alleviated by the buffering of supportive adults.[16] When there is toxic stress, "[t]he part of the

25  brain that triggers the stress response (the amygdala) may become overdeveloped and overactive,

26

27  ──────────────────────

28  [16] Ziba Kashef, Toxic stress exposure in childhood linked to risky behavior, adult disease (hereinafter Toxic Stress), YALE NEWS, Nov. 19, 2015, https://news.yale.edu/2015/11/19/toxic-stress-exposure-childhood-linked-risky-behavior-adult-disease

DEFENDANT'S SENTENCING MEMORANDUM
*REYES ALEMAN*, CR 2022–390 RS

while other areas of the brain that govern memory, learning, and decision-making underdevelop."[17] One researcher stated that "most worrisome" "is that areas like the prefrontal cortex, which is where we do most of our thinking and decisionmaking, may not become as developed as the other, more emotion-regulated parts of the brain."[18] The Court should consider how the impact of youth and chronic stress affected Mr. Reyes' ability to make appropriate choices, rather than attributing his actions to inherent criminality.

Second, the Court should consider Mr. Reyes' youth in granting a downward variance because Mr. Reyes is someone who, with no other criminal history, has a real chance at a law-abiding future ahead of him given the hope of brain maturity and functioning with age and proper supports. Mr. Reyes is not someone the Court encounters mid-life with a string of convictions and violations. Rather, he will mature as he grows older, he has been given supports through this case, and he will have the means to live a law-abiding life and not reoffend.

### B.   Poverty, vulnerability, and desperation as a victim of gang violence and labor trafficking

The Court should also consider a significant downward variance for Mr. Reyes due to the extremely challenging circumstances he endured as a young person and his status as a victim of trafficking. As well documented in the PSR, news sources, and declarations from interviews with Mr. Reyes, his mother, and his older brother, Mr. Reyes only left Honduras to avoid having to work for gangs or risk losing his life. The poverty, violence, lack of protection from political institutions, and gang terrorization he faced made him leave his family and the life he knew while just a teenager. As described, he went through an unimaginably brutal journey to arrive in the U.S. The Court should consider all these factors that Mr. Reyes dealt with as just an adolescent and teenager as contributing to his vulnerability. Once he arrived in the U.S., he had no safety net and was trying to survive. His educational record in Honduras, including his studies in industrial mechanics, demonstrate that but for the circumstances he faced, he was a diligent student that may have obtained a secure, stable job. PSR ¶ 73. Instead, a baseline need to survive brought him to engage in the conduct he now pleads

---

[17] *Id.*
[18] *Id.*

1   guilty for.

2        Mr. Reyes is also a victim of labor trafficking. Three immigration practitioners have

3   interviewed him and made such a legal assessment. Carolyn Kim, Legal Director at Justice at Last,

4   has submitted a declaration in which she establishes that Mr. Reyes is a victim of human trafficking

5   as defined by 22 U.S.C. 7102 section (11)(B) and that he was under the control of the trafficker.

6   Larouche Decl. ¶ 5, Ex. D. Justice At Last is the only nonprofit in the Bay Area exclusively serving

7   the legal needs of survivors of human trafficking. *Id.* ¶ 3. Justice At Last has conducted numerous

8   interviews with Mr. Reyes and identified him as a victim of labor trafficking. *Id.* ¶ 6. As Ms. Kim

9   explains, labor trafficking can occur through force, fraud, or coercion and Mr. Reyes was coerced by

10   Carlos when in a very vulnerable circumstance at the border with nothing. *Id.* ¶ 7-8. Ms. Kim's

11   declaration sets forth the numerous ways in which Carlos' actions and Mr. Reyes' experience are

12   consistent with being a victim of trafficking. *See id.* ¶ 8-15. Further, Ms. Kim explains that trafficked

13   persons are often forced to commit crimes while under the control of their traffickers, leaving victims

14   in an even more vulnerable state because they feel they cannot report their circumstances. *Id.* ¶ 16-17.

15   While many states, including California, have laws allowing a trafficking defense, there is no federal

16   equivalent. *Id.* at 18. Just recently, the San Francisco Chronicle noted two criminal cases in which

17   county defendants raised a trafficking defense; both cases resulted in hung juries.[19] While there is

18   controversy over whether individuals in these situation are "criminals" or "victims" that black and

19   white approach does not account for the nuanced reality of forced labor in drug dealing. As Ms. Kim

20   details, in her vast experience working with trafficking victims, it is very common for victims to have

21   been forced to commit crimes and that conduct does not undermine their status as a victim of

22   trafficking. Ex. D ¶ 20-21. Further, a criminal record does not disqualify an individual from T-Visa

23   eligibility because Congress created a safeguard knowing that victims are often forced into criminal

24   conduct. *Id.* ¶ 23 (citing INA § 212(d)(3)). Considering all of Mr. Reyes' circumstances and Justice

25   At Last's breadth and knowledge in the area of trafficking, they took Mr. Reyes on as a client and

26

27   [19] Megan Cassidy, *Two men beat S.F. drug-dealing charges after lawyers argue they were human trafficking victims*, SAN FRANCISCO CHRONICLE, Mar. 28, 2023,

28   https://www.sfchronicle.com/crime/article/san-francisco-trials-accused-dealers-trafficking-17856120.php

DEFENDANT'S SENTENCING MEMORANDUM
*REYES ALEMAN*, CR 2022–390 RS

have submitted a T-Visa application on his behalf. *Id.* ¶ 24. If granted, Mr. Reyes would receive a work permit and a chance to restart his life in the U.S. *Id.*

In addition to Justice At Last, immigration experts from the organizations Centro Legal de la Raza and Dolores Street Community Services also interviewed Mr. Reyes and have submitted letters noting his status as a victim of human trafficking. Larouche Decl. ¶ 6, Ex. E.

Consistent with the immigration practitioners' opinions, Professor Annie Isabel Fukushima of the University of Utah, has submitted her analysis and findings that Mr. Reyes' experiences are consistent with labor trafficking. Larouche Decl. ¶ 4, Ex. C. Professor Fukushima specializes in the fields of human trafficking and migration and has conducted research, published, and provided expert witness testimony on the issue of human trafficking. Ex. C at 1-2. She describes how, consistent with the literature, Mr. Reyes was preyed upon because of his vulnerabilities. *Id.* at 4-5. Professor Fukushima also sets forth how drug trafficking and labor trafficking are intertwined and how labor trafficking is often described as hidden, especially because people commonly equate human trafficking with sex trafficking or other forms of labor, such as domestic or agricultural work. *Id.* at 4-6. Specifically, Professor Fukushima's research found that after surveying 187 child welfare workers, probation officers and non-governmental organization workers in California, "half of the respondents said they were likely or very likely to work with children who were forced to cultivate, sell and/or transport drugs and a little less than half (43%) of the respondents asked about working with children who were forced to steal, sell and/or transport weapons or stolen goods, were more likely, than not, to see these forms of trafficking." *Id.* at 5-6. This research demonstrates the prevalence of trafficking among youth and how under-identified and reported these issues can be. *See id.* Like Justice At Last's assessment, Professor Fukushima also highlights that the idea of the "perfect victim" to constitute a victim of human trafficking is incorrect. *Id.* at 6. Further, victims are often unable or cannot report their circumstances as they are operating under fear or misinformation; nearly 70% of victims are undocumented. *Id.* Reviewing methods of coercion commonly used by traffickers and applying them to Mr. Reyes' case, Professor Fukushima also arrives at the conclusion that Mr. Reyes is a victim of labor trafficking under the Trafficking Victims Protection Reauthorization Act (TVPRA). *Id.* at 3, 7-9. Specifically, she reviews the methods of intimidation,

power, and control that Carlos used to leverage Mr. Reyes' vulnerabilities including weaponizing hunger, creating social isolation and dependency, perceived omnipotence, and threats. *Id*. at 8-9.

In sum, at least four experts in the fields of immigration and human trafficking have reviewed Mr. Reyes' case and have submitted documentation to the Court of their assessment that he is a victim of human trafficking. The Court should consider this substantial information that lessens his criminality and downward vary accordingly.

**III.  Deterrence cannot be achieved by prison alone when individuals are trafficked into drug sales.**

The Court also considers the need for general and specific deterrence. While a higher prison sentence may provide more general deterrence under common or logical circumstances, that is not the case here with Mr. Reyes and the Court must consider his individualized circumstances. Mr. Reyes was trafficked into drug sales when it was his only way to survive. Faced with losing his life or his family being harmed, he sold drugs. Under these circumstances, general deterrence theories do not apply. Mr. Reyes was not able to be a rational actor weighing the consequences of his actions; instead, he was a victim of trafficking. Further, general deterrence would be best served by efforts focused on the traffickers themselves. So long as they act with impunity, they plug in another disposable, desperate, and vulnerable undocumented person to sell drugs on the streets. Again, extremely vulnerable individuals trafficked into drug sales do not face logical choices or decisions such that a prison sentence would deter conduct like that of Mr. Reyes.

**IV.  Seriousness of the offense, promote respect for the law, and provide just punishment.**

The seriousness of the drug problem, crime, addiction, and deaths due to drugs in San Francisco, and especially in the Tenderloin neighborhood, cannot be understated. Surely the government will argue that if drug crime is too stop, prison sentences must be doled out. However, a sentence of a year and a day is a serious one, especially under the conditions Mr. Reyes has been in at Santa Rita where he's been subject to violence, abuse, and mistreatment in addition to generally miserable conditions. Further, Mr. Reyes would still be subject to three years of supervised release where he'd been under close supervision by probation. This combination of punishment is just but also does not overly punish a young victim of violence, terror, and trafficking.

**V.     Protection of the public.**

Mr. Reyes does not pose a threat to the public. He is young and has no prior criminal convictions. He has one prior arrest that occurred two months before the federal arrest, but no charges were brought against him. Moreover, he is a completely different position than when he was arrested. Mr. Reyes is now identified as a victim of human trafficking and connected to resources. Defense counsel has attached a Reentry and Alternative to Incarceration Plan that sets out how Mr. Reyes' various needs from housing, to education, to employment skills, and mental health services will be met. Larouche Decl. ¶ 10, Ex. I. Mr. Reyes now has many supports. His immigration counsel at Justice At Last is assisting with connections to organizations that can support him in addition to their support. Ex. D. The shelter manager of Ruby's Place/Casa de Ruby, a shelter that serves survivors of human trafficking, has also interviewed Mr. Reyes with the assistance of undersigned counsel and determined that he is a victim of human trafficking that could reside there once space is available. Larouche Decl. ¶ 8, Ex. G. Ruby's Place provides comprehensive case management and support services in the areas of employment, education, housing, and health. Ex. G ¶ 3. The Federal Public Defender's social services committee has also identified health services, mental health services, and employment skills programs and education programs that Mr. Reyes could access, including English language classes, that will help him obtain lawful work in the U.S. *See* Ex. I. Finally, the International Rescue Committee (IRC) has submitted a declaration explaining the resources they can provide through their anti-trafficking caseworkers. Larouche Decl. ¶ 7, Ex. F. IRC has already stated they would accept Justice At Last's assessment of Mr. Reyes as a survivor and could assess him as a client. *Id.* ¶ 5.

All of these identified and accessible resources make clear that Mr. Reyes will no longer be alone. He will have the support of community organizations that will help him integrate into society and access necessary resources for his success.

**VI.    Providing Mr. Reyes with needed training, medical care, or other correctional treatment in the most effective manner.**

Mr. Reyes' need for training and medical care will be best served out of custody. As an undocumented person, were to go to a Bureau of Prisons facility, despite his pending T-Visa, he would likely not be entitled to significant prison programming and training. Mr. Reyes also need

mental health treatment after the traumas he's suffered and he is unlikely to receive the specialized supports for victims of trafficking identified above if he were to go to prison. Accordingly, a sentence of one year and a day would best serve the goals of sentencing.

### CONCLUSION

For the reasons stated, Mr. Reyes respectfully requests that the Court impose a sentence of one year and one day and the maximum term of supervised release.

//

Dated:      March 29, 2023                                    Respectfully submitted,

JODI LINKER
Federal Public Defender

_____/S_____
Elisse Larouche